# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James F. Holderman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 1725 | **DATE** | 12/11/2002 |
| **CASE TITLE** | DAHLIN vs. JENNER & BLOCK et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
 ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Pursuant to Memorandum Opinion and Order entered this day, defendants Jenner & Block and Peterson's motions for summary judgment are denied. Defendant Campbell's motion for summary judgment on counts III and IV is granted and defendant Campbell is hereby dismissed. All other pending motions are moot. All previously set dates shall stand.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | DEC 12 2002 date docketed | 90 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | 12/11/2002 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| JS | courtroom deputy's initials | 02 DEC 11 PM 12:02 | JS mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BARBARA L. DAHLIN,<br><br>Plaintiff,<br><br>v.<br><br>JENNER & BLOCK, L.L.C., an Illinois Limited Liability Company, RONALD R. PETERSON, ESQ., and CHRISTY L. CAMPBELL, ESQ.,<br><br>Defendants. | No. 01 C 1725<br><br>DOCKETED<br>DEC 1 2 2002 |

## MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

On August 24, 2001, plaintiff Barbara L. Dahlin ("Dahlin") filed her second amended complaint against defendants Jenner & Block, LLC ("Jenner"), Ronald R. Peterson ("Peterson") and Christy L. Campbell ("Campbell"), alleging four counts of legal malpractice. Defendants have each filed separate motions for summary judgment pursuant to Fed.R.Civ.P. 56. Counts I and II state claims against Jenner and Counts III and IV state claims against all defendants. For the following reasons, this court denies Jenner's and Peterson's motions for summary judgment and grants Campbell's motion for summary judgment.

## STATEMENT OF FACTS

From 1986 until mid-1997, Dahlin and Dahlin's husband, Rodney Dahlin ("Rodney") owned a manufacturing company known as C.A. Dahlin Company ("Old Dahlin"). Dahlin was an officer

1



and director of Old Dahlin. Old Dahlin was housed in an industrial building located at 2451 Estes Avenue, Elk Grove Village, Illinois ("Building") and Dahlin was the sole beneficiary of a land trust ("Land Trust") that owned the Building. Dahlin possessed the sole power of direction of the Land Trust trustee, Uptown National Bank ("Uptown"). The Building was encumbered with a first mortgage ("Mortgage") from Uptown, and the Mortgage was guaranteed by Dahlin and Rodney. The Mortgage required monthly payments of principal, interest, and real estate tax escrow payments.

Dahlin first became a client of Jenner's in November of 1993 when the Dahlins retained Peterson, a partner at Jenner, to represent their interests in a bankruptcy proceeding involving Old Dahlin ("1993 Bankruptcy Proceeding"). During the 1993 Bankruptcy Proceeding, a new triple-net lease was drafted between Old Dahlin and the Land Trust ("93 Lease"), of which Dahlin was the sole beneficiary. Page 1 of the rider to the 93 Lease contained a provision which stated, in relevant part:

"Real Estate Taxes: Lessee shall pay as additional rental for the Premises . . . all taxes and assessments, . . . becoming due and payable during the term of this Lease, . . ; all of which . . . shall be paid by Lessee before they shall respectively become delinquent and in any case within such time as to prevent any sale or forfeiture of the Premises . . . ." (Pl.'s Resp. Ex. 9.)

Old Dahlin was a tenant at the Building pursuant to the 93 Lease until mid-1997, and up until August 1997, Old Dahlin paid monthly rent to the Land Trust and monthly real estate taxes directly into an escrow accounted maintained at Uptown.

On or about July, 1997, Old Dahlin entered into an asset sale agreement whereby the assets of Old Dahlin were sold to Dahlin Corporation ("New Dahlin"). As an integral part of the asset transaction, the Land Trust and New Dahlin entered into a new industrial ("97 Lease") upon the same provisions and identical economic terms that were contained in the 93 Lease between the Land Trust and Old Dahlin. The asset purchase agreement provided that Old Dahlin assist in the procurement

of a lease "on like terms as which currently exist between Seller and Barbara L. Dahlin . . . ." (Pl.'s Resp., Ex. 13 at 14). From July through August 1997, the Dahlins, with Peterson as their attorney, negotiated with New Dahlin and its attorney regarding the terms of the asset purchase agreement and the 97 Lease, as part of the asset purchase agreement. Dahlin told Jenner that the 97 Lease between the Land Trust and New Dahlin was to be a triple-net lease. The exact language of Dahlin's instructions to Jenner are disputed as to whether Dahlin asked for the 97 Lease to be completely identical to the 93 Lease, or simply for the two leases to have the same or substantially similar economic terms.

On July 30, 1997, Dahlin and Rodney, along with David Onion, the president of New Dahlin, executed an agreement each indicating their mutual understanding concerning the asset purchase agreement between New Dahlin and Old Dahlin, and the 97 Lease. In the July 1997 agreement, Dahlin and Rodney each provided a guarantee of all payments due under the 97 Lease. The 97 Lease was executed on August 15, 1997, between New Dahlin, as tenant, the Land Trust as Landlord, and Dahlin, on behalf of the Land Trust. The parties dispute exactly how long Dahlin had the lease document in her possession prior to the execution of the lease, and whether she saw or read the 97 Lease prior to the day she signed it, but, it is undisputed that Dahlin at least scanned each page of the lease document before initially and signing it. It is also undisputed that the 97 Lease did not contain any provision obligating New Dahlin to pay any real estate taxes in connection with the Building.

The 97 Lease required New Dahlin to pay monthly rent in the amount of $11,595.00 to Dahlin. Dahlin was obligated to make a monthly payment of principal and interest to Uptown in the amount of $9,000.00 and therefore, under the 97 Lease, Dahlin was receiving monthly rental income

3

in the amount of $2,595.00. At the time of the closing of the asset purchase transaction, New Dahlin mistakenly believed that it was responsible for paying the real estate taxes as part of the terms of the 97 Lease and the asset purchase agreement. From August 1997 through May 1998, New Dahlin paid the real estate taxes for the Building directly to Uptown on a monthly basis.

On May 12, 1998, New Dahlin informed Dahlin that it had come to its attention that New Dahlin had been erroneously paying real estate taxes on the 97 Lease since the 97 Lease did not have a term requiring it to do so; therefore, New Dahlin asserted, it would no longer make the real estate tax payments and further, it wanted a credit against future rent payments in the amount of $58,035.20 for the real estate taxes that it had paid prior to that date. Two days later, on May 14, 1998, Rodney had a conference with Peterson to discuss New Dahlin's refusal to pay real estate taxes and the Dahlins have presented some evidence that Peterson advised Rodney not to pay the Mortgage or real estate tax payments escrowed under the Mortgage and to let Uptown foreclose on the Building. On June 18, 1998, the Dahlins again asked Peterson if they should cure the default on the Mortgage and pay the real estate taxes in order to postpone the foreclosure action.

On June 22, 1998, the Dahlins met with Peterson at Jenner to discuss this and other business matters on which Peterson was representing the Dahlins. Campbell was present for at least part of the June 22, 1998 meeting, though it is unclear from the record for how long. At that meeting, Rodney raised the question of whether the 97 Lease was improperly drafted because it failed to include a provision requiring New Dahlin to pay the real estate taxes. At some point in time after Rodney posed this question, Peterson left the room and the tone of the meeting became tense. When Peterson returned, Peterson told the Dahlins if they felt they had a claim against Jenner, "I would like to know that as soon as practical because there are a lot of problems here, and I don't want to go

4

down a long road and solve these problems only to have you sue me." Peterson also stated "if you think you have a cause of action against me, tell me now, I'll resign you as a client and notify my carrier." At that point in time, Dahlin began crying and asked Peterson not to "abandon" them. When asked by Dahlin about any claims the Dahlins may have against Jenner for the drafting of the 97 Lease, the parties dispute whether Peterson actually advised the Dahlins that they did not have a claim because Jenner did not attend the closing of the asset purchase transaction and therefore was not responsible. The parties also dispute whether Dahlin believed this alleged statement by Peterson, and at what point in time, if any, Dahlin first discovered or should have discovered that she had a claim against Jenner.

After this discussion, Peterson returned to working on outstanding issues. Dahlin asserts that Peterson advised Dahlin that it was in her best interest to stop making payments under the Mortgage and to allow the Building to go into foreclosure, and further advised Dahlin that she should save the rent money she received from New Dahlin for Jenner's legal fees. Dahlin did not continue to pay the Mortgage and real estate taxes on the Building, and as a result, in August 1998 Uptown commenced foreclosure of the Building pursuant to the Mortgage. The foreclosure case was concluded on or about July 1, 1999 with a court order confirming the foreclosure sale to a third party.

In September, 1998, the Dahlins sought advice from attorney James Pluymert, who filed the original complaint in this lawsuit on behalf of Dahlin on March 12, 2001. Mr. Pluymert's further role in representing and advising Dahlin is disputed. On May 4, 2000, Dahlin and Jenner entered into a tolling agreement ("Tolling Agreement") in which the parties agreed to toll the time for the limitation of any action brought by Dahlin against Jenner relating to Jenner's legal counsel to Dahlin in connection with the 97 Lease agreement between Dahlin and New Dahlin.

After the Building was purchased out of foreclosure, New Dahlin remained in the Building until about May 2000, and paid monthly rental checks of $15,998.78 to the new landlord. Today, the Building is currently owned by the same entity that purchased it out of the foreclosure action and is being rented to a new tenant at a monthly rent of $22,937.71. Dahlin has presented evidence that the Building has a current appraised value of $2,500,000.00.

## STANDARD OF REVIEW

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in the nonmovant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1996). This court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. A party who bears the burden of proof on a particular issue, however, may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 2553 (1986).

## ANALYSIS

I. Statute of Limitations

First, this court finds that the statute of limitations has not run on Dahlin's claims. In Illinois, a two-year statute of limitations applies for claims against attorneys arising out of the performance of legal services. 735 ILCS 5/13-214.3(b). Jenner argues that counts I and II accrued more than two

years before Jenner and Dahlin entered into the May 4, 2000 tolling agreement, in which Jenner and Dahlin agreed to toll the time for the limitation of any action brought by Dahlin against Jenner relating to Jenner's legal counsel to Dahlin in connection with the 97 Lease between Dahlin and New Dahlin. Jenner contends that Dahlin's action accrued as early as March 17, 1998, when Dahlin either knew or should have known of the injuries for which she is seeking damages in counts I and II.

A cause of action for legal malpractice "does not accrue until a plaintiff discovers, or within a reasonable time should discover, [her] injury and incurs damages directly attributable to counsel's neglect." Lucey v. Law Offices of Pretzel & Stouffer, 301 Ill.App.3d 349, 353, 703 N.E.2d 473 (1 Dist. 1998). Damages "must be incurred and are not presumed." Id. "Where the mere possibility of harm exists or damages are otherwise speculative, actual damages are absent and no cause of action for malpractice yet exists." Id. Here, the parties dispute exactly when Dahlin discovered, or should have discovered her injury. However, because this court finds the issue of when actual damages were incurred is dispositive of the statute of limitations question, this court need not discuss exactly when Dahlin knew or should have known of her injury.

As to actual damages, Jenner insists that because Dahlin paid legal fees to Jenner in April, 1998 for Jenner's preparation of the 97 Lease, that Dahlin incurred actual damages as a result of Jenner's alleged malpractice, causing the statute of limitations on counts I and II to begin running at that time, which is two years before the May 4, 2000 tolling agreement. This court disagrees. It belies logic to state that legal fees Dahlin paid to Jenner *for the preparation* of the 97 Lease were actually *caused by* Jenner's alleged drafting negligence. Dahlin's payment of legal fees was for the purpose of purchasing Jenner's legal service in drafting the lease, and were not induced or caused by any alleged negligent acts or omissions by Jenner in the drafting process. Jenner also

7

emphatically argues that because Dahlin seeks to recover these legal fees as part of her damages in counts I and II, that therefore they are actual damages sufficient to accrue Dahlin's malpractice claims. Again, this court does not find that simply because Dahlin seeks to recoup as actual damages money she paid to Jenner as attorneys' fees, that this money is then transformed into actual damages as a matter of law. This court finds that Dahlin did not suffer actual damages from Jenner's alleged negligent omission of a provision in the 97 Lease requiring New Dahlin to pay any real estate taxes as part of rental until New Dahlin actually stopped paying the real estate taxes for the Building, which undisputedly occurred sometime after May 12, 1998 when New Dahlin first notified Dahlin of the omission of the real estate tax provision. Therefore, counts I and II are not barred by the statute of limitations because those claims did not accrue more than two years prior to the May 4, 2000 tolling agreement.

Defendants make the same arguments as to counts III and IV, contending that Dahlin incurred actual damages due to defendant's alleged malpractice for their services in connection with the foreclosure of the Building when Dahlin paid legal fees to Jenner for those same services. Again, this court finds Dahlin did not suffer actual damages attributable to defendant's alleged malpractice with respect to the foreclosure until July 1, 1999, when judgment was entered against Dahlin in the foreclosure proceedings, which is less than two years before May 10, 2001, when counts III and IV were added to this lawsuit upon the filing of Dahlin's first amended complaint. Up until that date, Dahlin could have paid the deficiency claimed by the Mortgagee and prevented, or at least postponed the foreclosure. In fact, this court notes, Dahlin has presented evidence that in June 1998, less than one month before the foreclosure, Dahlin was able to cure the loan default thereby postponing foreclosure, and Dahlin sought advice from defendants as to how to proceed. (Pl.'s Resp., Ex. 33).

II. Counts I and II

Next, Jenner contends that Dahlin cannot prove as a matter of law that Jenner's alleged negligence in omitting the real estate tax payment provision from the 97 Lease proximately caused her damages in counts I and II. Jenner argues that Dahlin told Jenner to draft the 97 Lease identical to the prior lease on the Building ("93 Lease"), and because the 97 Lease and the 93 Lease were materially different on their face, Dahlin knew or should have known when she signed the 97 Lease that it was not identical to the 93 Lease. Jenner further maintains that proximate cause is defeated because Dahlin initialed, signed, executed, and at least scanned each page of the 97 Lease.

In support of its arguments, Jenner maintains that Illinois courts have recognized that in a legal malpractice case based on an alleged drafting error, depending on the factual circumstances of the case, proximate causation may not lie where the document's meaning requires no legal explanation because it is readily apparent and the client is well educated, unimpaired and had the opportunity to review the document she signed. See Hermitage Corp. v. Contractors Adjustment Co., 166 Ill.2d 72, 90, 651 N.E.2d 1132 (1995 (*dicta in dissent*); Sutton v. Mytich, 197 Ill.App.3d 672, 678-79, 555 N.E.2d 93, 97-98 (3d Dist.1990) ("A client ordinarily relies upon the representations of his attorney. Whether the failure of a client to read a particular document necessarily defeats a malpractice action is dependent upon the particular circumstances."); Alper v. Altheimer & Gray, 2002 WL 31133287, at *34-35 (N.D. Ill. Sept. 26, 2002) (client's signature on very complex stock purchase agreement was not defense to legal malpractice claim). In this case, factual disputes exist as to Dahlin's exact instructions to Jenner on the 97 Lease drafting, how long, if at all, Dahlin had the draft of the 97 Lease in her possession prior to execution, whether the 97 Lease, a 10-page document, is a simple straightforward document requiring no legal explanation

because of a readily apparent meaning, and whether Dahlin is educated and sophisticated enough to understand the lease terms to relieve Jenner of any alleged negligence. These are questions of material fact for the jury to decide at the trial.

Jenner further contends that even including the 93 Lease tax provision in the 97 Lease would not have accomplished Dahlin's stated goal. The 93 Lease contains a provision in the rider which states, in pertinent part:

> "Real Estate Taxes: Lessee shall pay as additional rental for the Premises . . . all taxes and assessments, . . . becoming due and payable during the term of this Lease, . . ; all of which . . . shall be paid by Lessee before they shall respectively become delinquent and in any case within such time as to prevent any sale or forfeiture of the Premises . . . ." (Pl.'s Resp. Ex. 9.)

Jenner argues that under this clause, the lessee, New Dahlin, could have refused to pay the real estate taxes until they were "delinquent" or for at least two years from their due date, until the sale or forfeiture of the Building under the applicable time allotted by Illinois law. While this court does not find as a matter of law that based upon this provision in the 93 Lease, the lessee was required to pay the real estate taxes on a *monthly* basis, this provision nonetheless does require the lessee to pay the real estate taxes before they became "delinquent." In contrast, because the 97 Lease contained no tax provision, nothing in the 97 Lease required the lessee to pay the real estate taxes at all. Therefore, in this case, if the 93 Lease tax provision had been included in the 97 Lease, at a minimum, Dahlin would have been entitled to tax payments from New Dahlin, even if this court cannot find as a matter of law that the tax payments were required on a monthly basis. Had the 93 Lease tax provision been included in the 97 Lease, Dahlin would not have suffered the injury of having to pay

10

all real estate taxes on the Building, which she allegedly suffered. Therefore, drawing all justifiable inferences in favor of Dahlin, there appears to be a dispute of material fact and this court will not grant Jenner summary judgment on this basis.

III. Counts III and IV

Next, defendants argue that counts III and IV must fail because Dahlin has not presented any expert opinions that work performed by Jenner in connection with the foreclosure action was in any way negligent or a breach of the standard of care. In counts III and IV, Dahlin claims that in addition to the alleged 97 Lease negligence, defendants negligently and in breach of their fiduciary duty to Dahlin, placed their personal interests above Dahlin's interests in their subsequent advice and representation of Dahlin, which resulted in the Building foreclosure. Dahlin presents the testimony of expert witness Thomas Donnelly, who opines that, *inter alia*, defendants' conduct subsequent to the 97 Lease drafting fell below the duty of ordinary and reasonable care defendants owed to Dahlin. Viewing all evidence in the light most favorable to Dahlin, this court finds Dahlin has presented sufficient expert testimony to support her claims and create a triable dispute of fact to survive summary judgment. Whether defendants breached their duty of care owed to Dahlin is a question of fact for the trier of fact to resolve. See Metrick v. Chatz, 266 Ill.App.3d 649, 652, 639 N.E.2d 198 (1 Dist. 1994). Because Dahlin is attacking defendants' conduct leading up to and resulting in foreclosure, the lack of expert testimony by Mr. Donnelly specifically on the mishandling of the foreclosure action once it was filed is not fatal to Dahlin's claims. Dahlin has presented sufficient expert testimony to create a dispute as to whether defendants' advice prior to foreclosure and defendants' continued

11

representation of Dahlin was in bad faith and in its own personal interest to Dahlin's detriment. As to defendants' attacks on Mr. Donnelly's credentials, defendants will be free to appropriately question any alleged shortcomings of Mr. Donnelly on cross-examination at trial.

Defendants also contend that the rules of professional conduct do not establish a separate cause of action in counts III and IV for conflict of interest against an attorney independent from a breach of fiduciary duty or legal malpractice claim. This court does not find that Dahlin's claims are based solely upon a breach by defendants of the professional code of ethics. When, in the course of an attorney's professional dealings with a client, the attorney places the attorney's own personal interest above the interest of the client, the attorney is in breach of the attorney's fiduciary duty by reason of the conflict. In re Rosin, 118 Ill.2d 365, 381, 113 Ill.Dec. 276 (1987); Kling v. Landry, 292 Ill.App.3d 329, 335, 686 N.E.2d 33 (2d. Dist.1997). This court finds Dahlin has presented sufficient evidence to demonstrate a genuine dispute of material facts as to whether, as alleged, defendants breached the applicable standards of care to Dahlin. This court also rejects defendants' argument that Dahlin waived any conflict of interest claims she had when she elected to continue to pay for Jenner's legal services through March 2000. Disputed facts exist as to whether Dahlin made a knowing, voluntary waiver of any conflicts, including whether Peterson told Dahlin in June 1998 that Dahlin did not have a claim against Jenner for the omission in the 97 Lease because Jenner was not at the closing, whether Dahlin believed Peterson, and when Dahlin knew or should have known she had a claim against Jenner and Peterson.

Finally, Dahlin seeks damages including, *inter alia*, the value of the loss of the Building, lost income from the lease of the building, lost future profits as a result of the loss of the Building, and applicable legal fees paid to Jenner. Defendants contend that Dahlin cannot seek any lost profit damages because she has failed to present expert testimony in support of her lost profit claims. Lost profits are not a proper element of damages where proof of those profits is based on speculation. Girsberger v. Kresz, 261 Ill.App.3d 398, 410, 633 N.E.2d 781 (1 Dist. 1993). Because Dahlin has not presented any expert testimony to support her lost profits claims, the burden falls on her to establish, through her own testimony, competent proof of lost profits from which a reasonable basis of computation may be derived, and defendant's breach must be plainly traceable to specific damages Id.; Midland Hotel Corp. v. Reuben H. Donnelley Corp., 118 Ill.2d 306, 315, 515 N.E.2d 61 (1987).

Defendants point to the fact that New Dahlin filed for bankruptcy and stopped making payments to the successor owner and landlord of the Building on April 3, 2000, in arguing that there is no proof that had Dahlin remained landlord, she would have been able to replace the tenant before the expiration of the 1997 Lease and continued to earn rental income. Defendants further contend that Dahlin has not presented any evidence that she had experience procuring tenants for industrial buildings or that she would have been able to successfully manage and maintain the Building in the future. Viewing the undisputed facts in the light most favorable to Dahlin and resolving all justifiable inferences in Dahlin's favor, this court cannot conclude based on the evidence Dahlin has presented in the record that Dahlin would have suffered no lost profit damages at all such that summary judgment against

Dahlin as to any lost profits would be warranted. Pursuant to the 1997 Lease, which had a term of five years, Dahlin was earning monthly rental income in the amount of $2,595.00. There is evidence that Dahlin intended to keep the Building, pay down the mortgage and utilize rental income as her retirement income. There is also at least some evidence that she would have been able to do that at a minimum through the end of New Dahlin's tenancy had the 97 Lease contained the real estate tax provision. In addition, there is further evidence that the value of the Building has appreciated in value to $2,500,000.00. Consequently, this court finds that Dahlin has presented sufficient evidence to provide a reasonable basis for computation of an amount of lost profits she has allegedly suffered, and therefore enough evidence to survive defendants' summary judgment motion. Any question as to Dahlin's lack of experience or business acumen, or her inability to procure future tenants for the industrial building is for the jury at the trial.

IV. Campbell

Because Dahlin has failed to produce any evidence or opinion testimony to support her allegations in counts III and IV against Campbell, this court grants Campbell's motion for summary judgment and dismisses Campbell from this litigation. In counts III and IV, Dahlin alleges Campbell committed legal malpractice in her representation of Dahlin after the drafting of the 97 Lease and in connection with the subsequent Building foreclosure. Campbell was not employed at Jenner at the time the 97 Lease was drafted and was a first year associate at Jenner when she worked on the foreclosure matter for the Dahlins. In Dahlin's statement of additional facts pursuant to Rule 56.1(b), Dahlin does not attribute any specific alleged negligent acts or omissions of Jenner to Campbell individually and Dahlin

14

has not presented any evidence that Campbell advised or represented Dahlin in bad faith thereby placing Campbell's own interests ahead of Dahlin's. Dahlin's only mention of Campbell in the evidence Dahlin presented is in the context of Campbell having been present for some part of Dahlin's and Rodney's June 22, 1998 meeting at Jenner with Peterson, and Campbell having heard certain portions of Peterson's statements to Dahlin and Rodney during that meeting. Dahlin's memorandum in response to Campbell's motion for summary judgment fails to address the deficiencies in the evidence supporting Dahlin's claims against Campbell. Dahlin's experts are silent as to any negligence by Campbell in connection with the foreclosure advice and representation. In his opinion report, Dahlin's expert, Donnelly, lumps Campbell into his collective definition of "Jenner" but fails to establish any specific conduct by Campbell which would support Dahlin's counts III and IV claims. Because Campbell was an associate at Jenner at the time of the alleged events, any vicarious liability which would arise had she been a partner is not present.

At this summary judgment stage in the litigation, Dahlin has the burden of proof to affirmatively demonstrate, by setting forth specific facts in the record, that there is a genuine issue of material fact for trial. Fed.R.Civ.P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553 (1986). This court finds that Dahlin has not satisfied this burden as to defendant Campbell, and therefore grants Campbell's motion for summary judgment.

## CONCLUSION

For all the reasons stated above, Jenner's and Peterson's motions for summary judgment are both denied. Campbell's motion for summary judgment on counts III and IV is granted and Campbell is dismissed from this litigation. Any pending motions are moot. All set dates remain. The parties are once again urged to discuss settlement of this case.

ENTER:

*James F. Holderman*
JAMES F. HOLDERMAN
United States District Judge

DATE: December 11, 2002